# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| THE TOX FRANCHISING GROUP, LLC, and THE TOX IP, LLC, | ) ) ) | |
| *Plaintiffs*, | ) ) | Case No. 3:26-cv-00141 |
| v. | ) ) | JURY DEMAND |
| TENNESSEE BODY SCULTPING CO., RACHEL BORYACHINSKIY, GERMAN BORYACHINSKIY, and JOHN DOES 1-2, | ) ) ) ) ) ) | |
| *Defendants.* | ) | |

## ANSWER AND COUNTERCLAIM

Come the Defendants, Tennessee Body Sculpting Co., Rachel Boryachinskiy and German Boryachinskiy, and answer the Complaint filed by Plaintiffs, The Tox Franchising Group, LLC and The Tox IP, LLC, as provided below. The Defendants, Tennessee Body Sculpting Co., Rachel Boryachinskiy and German Boryachinskiy, also assert the Counterclaim provided below.

## ANSWER

In response to the numbered paragraphs of the Complaint, the Defendants answer as follows:

1. The factual averments in numbered paragraph 1 are **Denied**.

2. The factual averments in numbered paragraph 2 are **Denied**.

3. The factual averments in numbered paragraph 3 are **Denied**.

4. The factual averments in numbered paragraph 4 are **Denied**.

5. The factual averments in numbered paragraph 5 are **Denied**.

6. The factual averments in numbered paragraph 6 are **Denied.**

7. The factual averments in numbered paragraph 7 are **Denied**.

8. The factual averments in numbered paragraph 8 are **Admitted**.

9. The factual averments in numbered paragraph 9 are **Admitted**.

10. The factual averments in numbered paragraph 10 are **Denied**.

11. The factual averments in numbered paragraph 11 are **Denied**.

12. The factual averments in numbered paragraph 12 are **Denied**.

13. The factual averments in numbered paragraph 13 are **unknown based upon the facts known to Defendants at this time**.

14. The factual averments in numbered paragraph 14 are **Admitted**.

15. The factual averments in numbered paragraph 15 are **Denied**.

16. The factual averments in numbered paragraph 16 are **Denied**.

17. The factual averments in numbered paragraph 17 are **Denied**.

18. The factual averments in numbered paragraph 18 are **Admitted**.

19. The factual averments in numbered paragraph 19 are **Denied**.

20. The factual averments in numbered paragraph 20 are **Denied**.

21. The factual averments in numbered paragraph 21 are **Denied**.

22. The factual averments in numbered paragraph 22 are **Denied**.

23. The factual averments in numbered paragraph 23 are **Admitted**.

24. The factual averments in numbered paragraph 24 are **Denied**.

25. The factual averments in numbered paragraph 25 are **Denied**.

26. The factual averments in numbered paragraph 26 are **Denied**.

27. The factual averments in numbered paragraph 27 are **Denied**.

28. The factual averments in numbered paragraph 28 are **Denied**.

29. The factual averments in numbered paragraph 29 are **Denied**.

30. The factual averments in numbered paragraph 30 are **Denied**.

31. The factual averments in numbered paragraph 31 are **Denied**.

32. The factual averments in numbered paragraph 32 are **Denied**.

33. The factual averments in numbered paragraph 33 are **Denied**.

34. The factual averments in numbered paragraph 34 are **Denied**.

35. The factual averments in numbered paragraph 35 are **Admitted**.

36. The factual averments in numbered paragraph 36 are **Denied**.

37. The factual averments in numbered paragraph 37 are **Denied**.

38. The factual averments in numbered paragraph 38 are **Denied**.

39. The factual averments in numbered paragraph 39 are **Denied**.

40. The factual averments in numbered paragraph 40 are **Denied**.

41. The factual averments in numbered paragraph 41 are **Denied**.

42. The factual averments in numbered paragraph 42 are **Denied**.

43. The factual averments in numbered paragraph 43 are **Denied**.

44. The factual averments in numbered paragraph 44 are **Denied**.

45. The factual averments in numbered paragraph 45 are **Denied**.

46. The factual averments in numbered paragraph 46 are **Denied**.

47. The factual averments in numbered paragraph 47 are **Denied**.

48. The factual averments in numbered paragraph 48 are **Denied**.

49. The factual averments in numbered paragraph 49 are **Denied**.

50. The factual averments in numbered paragraph 50 are **Denied**.

51. The factual averments in numbered paragraph 51 are **Denied**.

52. The factual averments in numbered paragraph 52 are **Denied**.

53. The factual averments in numbered paragraph 53 are **Denied**.

54. The factual averments in numbered paragraph 54 are **Denied**.

55. The factual averments in numbered paragraph 55 are **Denied**.

56. The factual averments in numbered paragraph 56 are **Denied**.

57. The factual averments in numbered paragraph 57 are **Denied**.

58. The factual averments in numbered paragraph 58 are **Denied**.

59. The factual averments in numbered paragraph 59 are **Denied**.

60. The factual averments in numbered paragraph 60 are **Denied**.

61. The factual averments in numbered paragraph 61 are **Denied**.

62. The factual averments in numbered paragraph 62 are **Denied**.

63. The factual averments in numbered paragraph 63 are **Denied**.

64. The factual averments in numbered paragraph 64 are **Denied**.

65. The factual averments in numbered paragraph 65 are **Denied**.

66. The factual averments in numbered paragraph 66 are **Denied**.

67. The factual averments in numbered paragraph 67 are **Denied**.

68. The factual averments in numbered paragraph 68 are **Denied**.

69. The factual averments in numbered paragraph 69 are **Denied**.

**Any factual averments not specifically admitted are hereby denied.**

## <u>AFFIRMATIVE DEFENSES</u>

The Defendants rely upon the following affirmative defenses:

1. Defendants rely upon the affirmative defense of **first material breach**.

2. Defendants rely upon the affirmative defense of **unclean hands**.

3. Defendants rely upon the affirmative defense of **violations of the Florida Franchise and Distributorships Act (F.S.A. § 817. 416)**.

4. Defendants rely upon the affirmative defense of **violations of the Florida Deceptive and Unfair Trade Practices Act (F.S.A. § 501. 201 *et. seq*)**

5. Defendants rely upon the affirmative defense of first **breach of the Implied Covenant of Good Faith and Fair Dealing**.

6. Defendants rely upon the affirmative defense of **fraudulent inducement**.

7. Defendants rely upon the affirmative defense of **fraudulent misrepresentation**.

8. Defendants rely upon the affirmative defense of **negligent misrepresentation**.

9. Defendants rely upon the affirmative defense of **unjust enrichment**.

## COUNTERCLAIM

### I.
### THE PARTIES

1. The Counter-Plaintiff, Rachel Boryachinskiy, is an individual franchisee who was awarded the region of Nashville, Tennessee.

2. The Counter-Plaintiff, Rachel Boryachinskiy, is the president and primary owner of Tennessee Body Sculpting, Co. that is a legal business entity in the State of Tennessee.

3. The Counter-Plaintiff, German Boryachinskiy, is an individual residing in Lebanon, Tennessee.

4. The Counter-Plaintiff, Tennessee Body Sculpting Co., is a Tennessee corporation who leased The Tox Technique service under *The Tox* brand.

5. The Counter-Defendant, The Tox Franchising Group, LLC, is a Florida limited liability company with a principal place of business located in Florida.

5

6. The Counter-Defendant, The Tox IP, LLC, is a Florida limited liability company that owns and licenses the trademarks, trade dress, and intellectual property associated with The Tox Technique system. All members of The Tox IP, LLC are residents of Florida.

**II.**
**JURISDICTION AND VENUE**

7. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8. This Court has personal jurisdiction over Counter-Plaintiffs because they reside in Tennessee, and operated the franchised business in this District.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Counter-Plaintiffs' claims occurred in the Middle District of Tennessee.

**III.**
**THE FACTS**

10. The Counter-Plaintiffs entered into the Franchise Agreement and Multi-Unit Development Agreement ("MUDA") in September 2024 based on Counter-Defendants' false representations.

11. The Counter-Defendants made the following false representations prior to the execution of the Franchise Agreement and Multi-Unit Development Agreement:

    a. That each studio's revenue is roughly $1M per year, of which, 80% of this revenue comes from The Tox's social media influencers. The Tox would send up to 12 influencers a month to the studio, who generate the majority of the studio revenue. This was listed in the slides during confirmation day, prior to Counter-Plaintiff's

entering into the Franchise Agreement or MUDA. Counter-Plaintiff, Rachel Boryachinskiy, attended confirmation day in the August 2024 session. The Franchise Disclosure was misleading because it did not disclose accurate revenue from all franchisees.

b. The Tox initially allowed franchisees to purchase a single region per agreement; however, after confirmation during signing Counter-Plaintiffs were required to purchase 2 or more locations in order to move forward as Franchisees. Counter-Plaintiffs agreed to purchase an additional location with the understanding that the Mt. Juliet location would be developed after the Nashville location was opened and profitable. The Nashville location from date of opening has not generated a profit and is filing a substantial loss on its 2025 tax returns.

c. That Counter-Defendant, The Tox, would manage and grow social media accounts. Counter-Defendant, The Tox, would handle all the marketing, social media management, advertising, etc. driving clients into the studio. The expectation from Counter-Defendants was franchisees are responsible for overseeing the day-to-day operations, but The Tox was responsible for driving the revenue and volume growth for the studio. There was very little to no growth on any social platforms. The Tox signed an agreement with Doe Media in April 2025 to outsource advertising on Google and Meta platforms. After working with Doe Media for 4 months, the ad agency was unable to generate any income for Counter-Plaintiffs' studio. When Doe Media was terminated, with the Tox's knowledge, Counter-Defendants would not allow Counter-Plaintiffs to engage any other ad agency to assist in local

7

advertising on Meta or Google. This further limited the ability to make any revenue, as most revenue is generated from the ability to advertise.

d. The Counter-Defendant, The Tox, promised to complete a market analysis to determine pricing prior to opening. This was never completed. After numerous complaints and comments from clients about the high cost of services, which were forwarded to The Tox, Counter-Defendants did not change or re-evaluate pricing. Instead, Counter-Defendants denied reviewing or providing an analysis to support the price point of services.

e. That Counter-Defendants would manage the website and provide adequate software for the business. Counter-Defendants' website thetoxtechnique.com's DMARC, SPF, and DKIM records were not authenticated properly, so all emails for nashville@thetoxtechnique.com are flagged as spam. Counter-Plaintiffs were unable to utilize for local marketing or communication with clients, since emails were automatically flagged as spam. There was very little ability to market or send emails to clients as a result. This further limited the ability to do any local marketing, outside of corporate.

f. That Counter-Defendants had products and services that were highly desirable. Counter-Plaintiffs were required to purchase $95,000 worth of products to sell in the studio. Counter-Plaintiffs have sold less than 10% of this inventory. Of the 10%, most was a result of using as part of a service, not retail sales.

12. The Counter-Defendants' claimed their system provided comprehensive operational support, centralized marketing execution, influencer-driven customer acquisition, national promotion, and a well-supported development process.

13. The Counter-Plaintiffs aver that Counter-Defendants falsely represented that the expected revenues would be over $1 million *per annum*.

14. The Counter-Plaintiffs aver that the Counter-Defendants claimed revenues would be guaranteed by them, in part, by bringing up to twelve (12) influencers per month who were to generate 80% of sales. They also promised to lead marketing, social media, brand management, and client acquisition, which given their limited efforts to assist the growth of the studio, did not generate revenue. Counter-Plaintiffs also had no access to any of these platforms, social accounts, or resources. The Counter-Defendants setup, operated, and were solely responsible for all marketing, social media, brand management, etc. per the Franchisee Agreement.

15. The Counter-Plaintiffs were told that approximately 80% of all revenue in The Tox system was generated through corporate-controlled marketing.

16. In reliance on these representations, the Counter-Plaintiffs paid all required franchise fees, training costs, and initial expenses, and proceeded with construction, permitting, staffing, and marketing preparations for the Nashville studio.

17. The Counter-Plaintiffs relied upon these false representations to their detriment and entered into the Franchise Agreement and the Mult-Unit Development Agreement. As a result, they have lost $20,000 - $30,000 each month because they reasonably relied upon Counter-Defendants' false representations. Counter-Plaintiffs have had to put in on average $30,000 each month to cover the business's operational costs.

18. Beginning in early 2025, the Counter-Defendants failed to provide required construction-related support, including, but not limited to:

    a.   timely review of floorplans;

b. approval of required fixtures and branding;

c. confirmation of layout specifications;

d. guidance on corporate-required materials; and

e. access to mandated vendors.

19. These delays forced the Counter-Plaintiffs' contractors to halt work, revise plans, and remobilize, resulting in substantial additional costs, including lost contractor hours, duplicated architectural expenses, buildout extensions, increased labor charges, and delayed ability to open and generate revenue.

20. The Counter-Plaintiffs aver that during Development, The Tox Corporate required them to order both the front desk and shelves from the Counter-Defendants manufacturing group. Unfortunately, when the furniture was delivered it was all broken and battered. The Counter-Defendants said there was no solution. The Counter-Plaintiffs were either going to have to delay opening by 8-12 weeks or repay themselves. The Counter-Plaintiffs' contractor agreed to repair the furniture, which is a required component to open. This again was at the Counter-Plaintiffs' expense.

21. The Counter-Defendants repeatedly failed to respond to operational and development requests, some for weeks at a time, including requests directly required for opening under the Agreement.

22. This pattern of non-communication severely disrupted construction, onboarding, marketing, and daily operations.

23. Marketing support, which the Counter-Defendants represented as a central benefit of joining the system, was not delivered.

24. The Counter-Defendants withheld required approvals for advertising.

10

25. The Counter-Defendants refused to grant access to social media and ad accounts for Nashville.

26. The Counter-Defendants ignored multiple requests for tools necessary to run local campaigns.

27. The Counter-Defendants denied the Counter-Plaintiffs the ability to deploy reasonable alternatives, even where the Counter-Defendants chosen vendors failed to produce results.

28. The Counter-Defendants also blocked or significantly delayed supply orders, including orders necessary to operate the studio, without explanation.

29. In many cases, requests for supplies sat for weeks with no communication.

30. The Counter-Defendants' actions caused direct, measurable financial losses, including, but not limited to:

    a. lost revenue from delayed opening;

    b. excessive construction costs due to repeated plan changes;

    c. lost influencer and customer opportunities;

    d. reduced brand visibility; and

    e. diminished operational capacity.

31. On multiple occasions, the Counter-Plaintiffs invoked Section 20's internal dispute-resolution process, sending written notices outlining specific issues requiring resolution and requesting direct leadership engagement. The Counter-Defendants again failed to respond.

32. The Counter-Plaintiffs aver that the Counter-Defendants were unresponsive to support tickets, even auto-rejected tickets from the studio. The Counter-Defendants stopped responding to any inquiry from the studio, including cancelling supply orders.

33. On September 12, 2025, the Counter-Plaintiffs sent a formal notification to the Counter-Defendants entitled "Internal Resolution & Compromise on Open Issues" as a response to the Counter-Defendants' ongoing material breach and dereliction of duty, as outlined in the Franchise Agreement:

> **DISPUTE RESOLUTION:**
>
> **Internal Dispute Resolution. Franchisee shall first bring any claim, controversy or dispute arising out of or relating to this Agreement, the Attachments hereto or the relationship created by this Agreement to Franchisor's president and/or chief executive officer for resolution. After providing notice as set forth in Section 21.7 below. Franchisee must exhaust this internal dispute resolution procedure before Franchisee may bring Franchisee's dispute before a third-party. This agreement to first attempt resolution of disputes internally shall survive termination or expiration of this Agreement.**

The Counter-Defendants did not acknowledge the Counter-Plaintiffs' dispute communication at all, which constitutes an independent breach of the Agreement.

34. Instead of engaging in the contractually-required internal dispute process, the Counter-Defendants retaliated by removing the Counter-Plaintiffs' Mt. Juliet development territory.

35. The Counter-Defendants acknowledge in Courtney's Declaration that the Counter-Plaintiffs have submitted two (2) options for site locations for the Mt. Juliet development. Counter-Plaintiffs again chose not to respond to these tickets that were submitted via The Tox's support system and included on The Tox's Monday board for Mt. Juliet.

36. The Counter-Plaintiffs disagreed and contested the termination of the MUDA. The Counter-Defendants again did not acknowledge. The Counter-Defendants did not acknowledge the Counter-Plaintiff's dispute communication at all, which constitutes an independent breach of the Agreement.

37. The Counter-Plaintiffs' exhausted all internal dispute resolution procedures, filing for AAA Demand for Arbitration on November 24, 2025 bringing worth again the improper termination of the MUDA, failure to provide marketing and operational support, withheld approvals, and cancellation of supplies without cause.

38. The Counter-Defendants did not acknowledge nor respond to the internal dispute resolution, nor did they contest the Counter-Plaintiffs' filing for AAA Demand for Arbitration, demonstrating their acceptance and knowledge of their non-response. Instead, the Counter-Defendants continued to retaliate cancelling supply orders, denying tickets, and refusing to assist the Counter-Plaintiffs with marketing, social media management, and revenue generation per their responsibility as outlined in the Franchise Agreement.

39. The Counter-Defendants acted in this manner despite the Counter-Plaintiffs' continued good-faith efforts and despite the fact that the Counter-Defendants' own delays were the primary source of any development timeline issues. The Counter-Defendants must approve all locations prior to development by the Counter-Plaintiffs.

40. The Counter-Defendants' refusal to follow its own dispute process, combined with retaliatory territory removal, underscores a broader pattern of arbitrary and bad-faith conduct designed to pressure the Counter-Plaintiffs, restrict their operational capacity, and shift blame for the Counter-Defendants' own performance failures.

41. The Counter-Plaintiffs have repeatedly requested access necessary to operate successfully, including, but not limited to:

   a. Access to Nashville's social media channels;

   b. The ability to run approved local ads;

   c. The ability to post brand-compliant content; and

d. Reasonable influence over the scheduling of corporate-controlled influencer appointments.

42. The Counter-Plaintiffs aver that the Tox-approved Ad agency they were forced to use, charged them for services that were never set up or completed. Over 4 months, the Ad Agency's services resulted in no client acquisitions and $0 revenue for Nashville. The Counter-Plaintiffs were charged substantially for the cost of the Ad Agency to manage ads and cost of the ad campaigns. The Counter-Defendants were aware of the current and ongoing issues with Ad Agency. Again, the Counter-Defendant chose not to assist or resolve any issues with the Ad Agency's poor services. After termination, the Counter-Defendants would not approve, discuss, or resolve any issues with the ads. Ads were shut down on July 30, 2025. This was one (1) month after the soft opening and one (1) day before the grand opening. The Counter-Defendants would not allow the Counter-Plaintiffs or another firm access to Meta or Google accounts. This was part of the internal dispute resolutions to which the Counter-Defendants never responded.

43. The Counter-Plaintiffs aver that the Counter-Defendants sent a MUDA termination that was caused by The Tox's inability to review locations submitted. There were 3 locations submitted for The Tox review over a period of 6 months, which remain in review by The Tox. The development options were both submitted via the Monday support ticket system and on the Mt. Juliet Monday project board, both provided by Corporate for communication.

44. The Counter-Plaintiffs aver that the Counter-Defendants sent two (2) frivolous non-compliance notices as a pretext to terminate the full agreement. The Counter-Plaintiffs

14

never received a non-compliance notice prior to mediation and have a 5-star rating on google, in addition to, an 85 NPS, which is exceptional.

45. The Counter-Plaintiffs aver that they never entered into an agreement with the landlord, Camden, to assign the leased properties at 1513 Demonbreun Street, Nashville, TN 37203 to the Counter-Defendants. The current lease on those premises is personally guaranteed by Rachel Borychinsky, and Camden has not agreed in writing to assign the lease to the Counter-Defendants.

46. The Counter-Defendants have received a written communication from Camden stating the lease is in effect with Rachel Boryachinskiy. Camden has further communicated to the Counter-Defendants several times the Lease Assignment was not executed and is not valid.

47. The Counter-Defendants cannot take assignment of the lease, as the breach of contract was by the Counter-Defendants. The Counter-Plaintiffs have not breached the MUDA.

48. The Counter-Plaintiffs aver that the Counter-Defendants have exhausted their timeframe to purchase, assign, or otherwise any and all Tox branded equipment, fixtures, and supplies. The Counter-Defendants failed to communicate what equipment, fixtures, or supplies the Counter-Defendants were "buying back" within thirty (30) days post-termination and have made no effort to communicate on these items.

49. The Counter-Plaintiffs aver that per the express terms of the Franchise Agreement they have ceased operating in the premises, and have ceased to operate directly or individually as a franchisee of The Tox consistent with Section 18 Post-Termination, 18.1.

50. The Counter-Plaintiff, Tennessee Body Sculpting Co., has ceased operations and is no longer doing business. All the employees have been laid off and are seeking unemployment benefits.

15

51. The Counter-Plaintiffs aver that the Counter-Defendants' so-called franchising system and purported opportunity is no opportunity at all. The Counter-Plaintiffs never received the support promised or expected from day one of their contractual relationship with the Counter-Defendants. As a result of becoming a franchisee of The Tox, the Counter-Plaintiffs have spent $600,000 on development, operations, and the continual need to cover monthly losses of the business.

52. The Counter-Plaintiffs aver that the Counter-Defendants have not established any goodwill at all in this market due to their actions. The Counter-Defendants mandated operations cease by close of business the following day from notice without any notification to clients or staff. The Counter-Defendants continue to keep social media, website, and booking systems open as if the business is in operation. The Counter-Defendants have caused significant bad will within the market.

53. The Counter-Plaintiffs aver that the Counter-Defendants have no goodwill in this market and their system has no actual value. Furthermore, the Counter-Defendants offered to buy the business back for $1.00. This is the value that the Counter-Defendants place on this business.

54. The Counter-Plaintiffs aver that the Counter-Defendants accessed financial transaction records of Tennessee Body Sculpting, Co. after the FA termination, illegally attempting to "take back" $17,000+ dollars of the Counter-Plaintiffs' earnings without any authority or legal right.

55. The Counter-Plaintiffs aver that the Counter-Defendants committed the first material breach of the Franchise Agreement and that they defrauded the Counter-Plaintiffs into entering into the Franchise Agreement.

56. The Counter-Defendants have continued to restrict access, issue contradictory directives, and impose compliance actions unrelated to the Counter-Plaintiffs' conduct.

57. The Counter-Plaintiffs have made every good-faith effort to resolve these matters internally and to preserve their contractual rights.

## CAUSES OF ACTION

### IV.
### BREACH OF CONTRACT
### (MULTIPLE COUNTS)

58. The Counter-Plaintiffs rely upon the factual averments in numbered paragraphs 1-57 in support of the following cause of action.

59. The Counter-Plaintiffs incorporate by reference all preceding paragraphs in support of the following cause of action.

60. The Counter-Plaintiffs aver that the parties entered into multiple contracts including the Franchise Agreement and MUDA.

61. The Counter-Plaintiffs aver that the Counter-Defendants failed to deliver agreed support.

62. The Counter-Plaintiffs aver that the Counter-Defendants failed to respond to required communications.

63. The Counter-Plaintiffs aver that the Counter-Defendants unreasonably withheld approvals without a legitimate basis.

64. The Counter-Plaintiffs aver that the Counter-Defendants denied access that was required for marketing.

65. The Counter-Plaintiffs aver that the Counter-Defendants ignored internal dispute procedure attempts.

17

66. The Counter-Plaintiffs aver that the Counter-Defendants have caused them material and financial harm.

67. The Counter-Plaintiffs aver that the Counter-Defendants wrongfully removed territory.

68. The Counter-Plaintiffs aver that the Counter-Defendants were in breach of all agreements referred to herein. These agreements are not made exhibits hereto because they are in the possession of all parties.

**V.**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH**
**AND FAIR DEALING**

69. The Counter-Plaintiffs rely upon the factual averments in numbered paragraphs 1-68 in support of the following cause of action.

70. The Counter-Defendants exercised their discretion in an arbitrary and bad-faith manner that deprived the Counter-Plaintiffs of the benefits of the agreements, contrary to their reasonable commercial expectations. This constitutes breaches of the implied covenant of good faith and fair dealing for which the Counter-Plaintiffs have sustained substantial damages.

**VI.**
**DECLARATORY JUDGMENT PURSUANT TO RULE 57 FED. R. CIV. P.**
**and 28 U.S.C.A § 2201**

71. The Counter-Plaintiffs rely upon the factual averments in numbered paragraphs 1-70 in support of the following cause of action.

72. The Counter-Plaintiffs seek a declaration that the MUDA was wrongfully terminated and remains valid and enforceable.

73. The Counter-Plaintiffs aver that the Counter-Defendants' deprivation of social media access, prevention of advertising activity, and refusal to follow the Agreement's dispute

18

resolution process are breaches of the Franchise Agreement and contrary to commercially reasonable standards within franchising. The Counter-Plaintiffs seek a declaration that Counter-Defendants committed the first material breach.

74. The Counter-Plaintiffs aver that the Counter-Defendants' reliance on false contractual termination provisions was pretextual and without a basis and seek a finding of such by this Court.

## VII.
## WRONGFUL TERMINATION

75. The Counter-Plaintiffs rely upon the factual averments in numbered paragraphs 1-74 in support of the following cause of action.

76. The Counter-Defendants' termination of the MUDA lacked factual and legal justification and constitutes wrongful termination under both contract and other applicable law.

## VIII.
## UNJUST ENRICHMENT

77. The Counter-Plaintiffs rely upon the factual averments in numbered paragraphs 1-76 in support of the following cause of action.

78. The Counter-Defendants have retained franchise fees, training payments, and marketing funds under circumstances where retention is unjust, particularly where those payments were made in reliance on Counter-Defendants' unfulfilled false representations.

## IX.
## VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT F.S.A §501. 201 *et seq.*

79. The Counter-Plaintiffs rely upon the factual averments in numbered paragraphs 1-78 in support of the following cause of action.

80. The Counter-Plaintiffs aver that the Counter-Defendants have engaged in acts which were unfair, deceptive, and/or unconscionable in the conduct of their trade and commerce and this constitutes violations of the Florida Deceptive and Unfair Trade Practices Act at F.S.A. §501. 201, *et seq*.

81. The Counter-Plaintiffs aver that they have incurred and sustained substantial damages as a direct and proximate result of the Counter-Defendants' violations.

## X.
## VIOLATIONS OF FLORIDA FRANCHISE AND DISTRIBUTORSHIPS ACT AT F.S.A §817. 416

82. The Counter-Plaintiffs rely upon the factual averments in numbered paragraphs 1-81 in support of the following cause action.

83. The Counter-Plaintiffs aver that the Counter-Defendants intentionally misrepresented the prospects and chances of success for The Tox franchise orally and in writing in the Franchise Disclosure prior to the Counter-Plaintiffs' execution of the Franchise Agreement and MUDA.

84. The Counter-Plaintiffs aver that they reasonably relied upon the Counter-Defendants' false representations to their detriment and have incurred significant financial damages as a direct and proximate result.

## XI.
## FRAUD AND FRAUD IN THE INDUCEMENT

85. The Counter-Plaintiffs rely upon the factual averments in numbered paragraphs 1-84 in support of the following cause of action.

86. The Counter-Plaintiffs aver that the Counter-Defendants made false statements regarding material facts with respect to the franchise opportunity as heretofore pled.

20

87. The Counter-Plaintiffs aver that the Counter-Defendants had knowledge at the time that their representations were false when made.

88. The Counter-Plaintiffs aver that the Counter-Defendants intended that their false representations would induce the Counter-Plaintiffs to act on it.

89. The Counter-Plaintiffs aver that the Counter-Plaintiffs reasonably relied upon the false representations and that they sustained significant financial injuries as a direct and proximate result.

90. The Counter-Plaintiffs aver that they would not have entered into the Franchise Agreement or the MUDA if they had known the true facts prior to executing these agreements.

## XII.
## <u>VIOLATIONS OF THE TENNESSEE CONSUMER PROTECTION ACT AT TENN. CODE ANN. § 47-18-104 *et seq.*</u>

91. The Counter-Plaintiffs' rely upon the factual averments in numbered paragraphs 1-90 in support of the following cause of action.

92. The Counter-Plaintiffs' aver that the Counter-Defendants violated the following sections of the TCPA specifically Tenn. Code Ann. § 47-18-104(a), (b), (7) and (12).

93. The Counter-Plaintiffs aver that Counter-Defendants' actions were willful, knowing, and intentional.

## XIII.
## <u>DAMAGES</u>

94. The Counter-Plaintiffs rely upon the factual averments in numbered paragraphs 1-93 in support of the following cause of action.

95. The Counter-Plaintiffs have incurred significant construction-related losses resulting from the Counter-Defendants' delayed approvals, inconsistent communication, and failure to provide timely guidance during the build-out phase. These delays increased labor and contractor costs, extended lease obligations, and postponed the studio's opening, resulting in measurable pre-opening revenue loss.

96. The Counter-Plaintiffs also suffered harm due to the Counter-Defendants' failure to engage in the internal dispute-resolution process required by Section 20 of the Franchise Agreement. After the Counter-Plaintiffs submitted written notice and requested internal resolution, the Counter-Defendants did not meaningfully participate and instead removed the Mt. Juliet territory during the dispute period. This retaliatory action caused additional financial harm and deprived the Counter-Plaintiffs of the development rights they had already paid for and relied upon.

97. Damages further arose from the Counter-Defendants' marketing misrepresentations and refusal to permit reasonable advertising autonomy. The Counter-Plaintiffs relied on representations that "80% of system sales" were generated through franchisor-controlled marketing and influencer placement. In practice, the Counter-Defendants failed to deliver effective marketing support and restricted the Counter-Plaintiffs from using alternative advertising channels, resulting in lost customers, reduced brand visibility, and operating losses.

98. The Counter-Defendants' control and restriction of the Counter-Plaintiffs' access to essential business systems—including the Nashville social media accounts and advertising platforms— also impaired the Counter-Plaintiffs' ability to communicate with customers, promote the studio, and respond to influencers or inquiries. These limitations created

22

ongoing revenue loss and reputational harm, and the Counter-Plaintiffs seek affirmative relief restoring full access to these systems to prevent continued damage.

99. As a result of the foregoing, the Counter-Plaintiffs have suffered lost profits, increased startup costs, diminished goodwill, and loss of the benefit of the bargain promised under both the Franchise Agreement and the MUDA. The Counter-Plaintiffs further seek recovery of fees and expenditures wrongfully induced by the Counter-Defendants' actions, including franchise fees, marketing costs, and training expenses, as well as attorneys' fees and costs as permitted by law.

**THE COUNTER-PLAINTIFFS PRAY FOR THE FOLLOWING RELIEF:**

1. That the Counter-Defendants be served and be required to timely answer;

2. That the Counter-Defendants' injunction be lifted and their Complaint be dismissed with prejudice;

3. That the Counter-Plaintiffs be awarded compensatory and punitive damages in an amount in excess of $15,000,000;

4. That the Court rescind the Franchise Agreement and the MUDA;

5. That Counter-Plaintiffs' be awarded treble damages and attorney's fees pursuant to Tenn. Code Ann §47-18-109;

6. That the Counter-Plaintiffs be awarded attorney's fees, expenses, and cost;

7. That this Court declares the rights of the parties with respect to the Franchise Agreement and the MUDA;

8. That the Counter-Plaintiffs be awarded pre- and post-judgment interest;

9. That the Counter-Plaintiffs be awarded such other, further relief to which they may be entitled; and

10. That a jury of six (6) be impaneled to hear this matter.

Respectfully submitted,

*/s/ G. Kline Preston, IV, Esq.*
G. Kline Preston, IV, Esq. (#017141)
KLINE PRESTON LAW GROUP
Belle Meade Office Park
4515 Harding Pike, Suite 107
Nashville, Tennessee 37205
Tel: 615-649-8680
Fax: 866-610-9565
kpreston@klineprestonlaw.com

*/s/ Stuart A. Burkhalter, Esq.*
Stuart A. Burkhalter, Esq. (#29078)
RILEY & JACOBSON, PLC
1906 West End Avenue
Nashville, Tennessee 37203
Tel: 615-320-3700
Fax: 615-320-3737
sburkhalter@rjfirm.com

*Attorneys for Defendants/Counter-Plaintiffs*

24

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been sent via e-mail and/or U.S. Mail, postage prepaid, on this the 17th day of March, 2026, to the following:

Mr. Roland W. Baggott III, Esq. (No. 023428)
BAGGOTT LAW, PLLC
4525 Harding Road, Suite 105
Nashville, Tennessee 37205
Tel: 615-620-4580
Fax: 615-620-4581
roland@baggottlaw.com

Mr. Evan M. Goldman, Esq. (*Pro Hac Vice*)
THE FRANCHISE FIRM, LLP
225 Wilmington West Chester Pike, Suite 200
Chadds Ford, Pennsylvania 19317
Tel: 215-965-1553
evan@thefranchisefirm.com

*Attorneys for The Tox Franchising Group, LLC and The Tox IP, LLC*

*/s/ G. Kline Preston, IV, Esq.*
G. Kline Preston, IV, Esq